# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 11, 2007          Decided August 7, 2007

No. 05-3196

UNITED STATES OF AMERICA,
APPELLEE

v.

JEFFREY EDWARDS,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00156-01)

———

*Ketanji B. Jackson*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A.J. Kramer*, Federal Public Defender. *Neil H. Jaffee* and *Tony W. Miles*, Assistant Federal Public Defenders, entered appearances.

*Bryan G. Seeley*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III*, *Lisa H. Schertler*, and *James W. Cooper*, Assistant U.S. Attorneys.

Before: SENTELLE, GARLAND, and KAVANAUGH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:  Jeffrey Edwards was a District of Columbia asbestos inspector who issued a permit to a contracting company that allowed the company to conduct an asbestos abatement project.  He told the company that he thought a more costly abatement procedure was required by the applicable regulations, but that he would permit it to use a less costly procedure if it paid him $10,000.  Unfortunately for Edwards, the FBI videotaped the transaction, and he was arrested and then convicted for bribery and extortion.  The district court sentenced Edwards to 33 months in prison.  Edwards now appeals, contending that the court erred in its application of the United States Sentencing Guidelines. Finding no error, we affirm the judgment of the district court.

I

Jeffrey Edwards was a senior inspector in the Air Quality Division of the District of Columbia Department of Health.  His duties included reviewing permit applications submitted by contractors who intended to demolish structures containing asbestos.  Federal regulations govern this type of demolition project.  *See* 40 C.F.R. § 61.140 *et seq.*  The regulations differentiate between asbestos-containing materials that are "friable" -- meaning "that, when dry, [they] can be crumbled, pulverized, or reduced to powder by hand pressure" -- and materials that are "nonfriable."  *Id.* § 61.141.  If a structure contains a sufficient amount of asbestos-containing material that is friable (or that could become friable), the regulations require contractors to follow a specific set of abatement procedures before they can demolish it.  *See id.* §§ 61.141, 61.145. Edwards' job was to inspect structures and to ensure that contractors' abatement plans complied with the pertinent regulations.

In 2002, the District of Columbia Department of Public Works requested bid proposals for the demolition of six structures at a waste transfer facility. It ultimately awarded the contract to Keystone Plus Construction. Edwards was responsible for monitoring the project and approving Keystone's demolition plan. Keystone hired Carlos Elizondo, an environmental consultant, to help prepare the plan. Elizondo's services to Keystone included meeting with Edwards to try to convince him that the asbestos-containing materials in the structures were nonfriable. This was important to Keystone, because a friable abatement is more expensive to conduct than a nonfriable abatement.

On January 27, 2003, Elizondo drove to Edwards' office for the meeting. According to Elizondo's trial testimony, Edwards insisted on meeting in Elizondo's car rather than in the office. The men began discussing the waste facility project, and Edwards said that he thought the asbestos-containing material at the site was friable rather than nonfriable. He observed that "[i]t's going to be a pretty expensive project if Keystone plans to do it as a friable project," predicting that "a full [friable] containment would . . . cost them a lot of money, about a hundred thousand dollars" more than a nonfriable containment. Trial Tr. 34 (Apr. 29, 2004 (AM)). He said, however, that in exchange for "special considerations," he could help Keystone obtain a "waiver" that would allow the company to treat the material as nonfriable. *Id.* at 37-38. When Elizondo asked, "[W]hat type of special considerations are you talking about?," Edwards responded "ten," which Elizondo took to mean $10,000. *Id.* at 38.

After the meeting, Elizondo contacted the FBI. Edwards and Elizondo had another meeting on February 13, 2003, this time at Elizondo's office and within view of FBI surveillance cameras. During the meeting, Elizondo produced $10,000 in

pre-recorded FBI funds. Edwards then wrote the word "approved" on Keystone's proposal to treat the asbestos-containing materials at the waste facility as nonfriable, and Elizondo handed him the money. Edwards also gave Elizondo a signed asbestos permit, allowing the company to begin implementing its nonfriable abatement plan. Edwards was arrested immediately upon leaving Elizondo's office. After his arrest, the District permitted Keystone to implement the same nonfriable abatement plan that Edwards had approved.

On April 10, 2003, a grand jury indicted Edwards on one count of soliciting and accepting a bribe, in violation of 18 U.S.C. § 201(b)(2), and one count of extortion, in violation of 18 U.S.C. § 1951. A jury found Edwards guilty on both counts on May 4, 2004.

The district court sentenced Edwards on October 25, 2005. The parties agreed that the relevant provision of the United States Sentencing Guidelines was § 2C1.1, entitled "Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right," and that under that guideline, Edwards' base offense level was 10. *See* U.S. SENTENCING GUIDELINES MANUAL § 2C1.1(a) (2003) [U.S.S.G.]. The parties disagreed, however, on how much the court should increase that offense level pursuant to § 2C1.1(b)(2)(A), which instructs:

> If the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense, whichever is greatest . . . exceeded $5,000, increase [the defendant's offense level] by the number of levels from the table in §2B1.1 . . . corresponding to that amount.

*Id.* § 2C1.1(b)(2)(A); *see* § 2B1.1 (table of offense level increases corresponding to specified dollar losses).

The government argued that, in applying § 2C1.1(b)(2)(A), the court should focus on the value of the benefit to be received by Keystone in exchange for the $10,000 bribe solicited by Edwards. In the government's view, this equaled the difference between the cost to Keystone of conducting a friable abatement at the waste facility and the cost of conducting a nonfriable abatement. It put this difference at $200,000, based on the trial testimony of another contractor, P.J. Goel, who estimated that "the difference between doing [the abatement] friable versus non-friable . . . was roughly $200,000." Trial Tr. 86 (Apr. 28, 2004 (PM)). This amount corresponded to a 10-level increase in Edwards' offense level. *See* U.S.S.G. § 2B1.1(b)(1). Edwards countered that the court should only consider the $10,000 value of the bribe, which would have corresponded to a 2-level increase. *See id.*

After hearing argument, the district court noted that "the defendant himself said that the cost differential would be roughly $100,000," and that Goel estimated that the differential would be more than twice that amount. Sentencing Hr'g Tr. 9-10 (Oct. 25, 2005). The court concluded that "the preponderance of the evidence does support at least a $100,000 valuation of the benefit," *id.* at 10, which corresponded to an 8-level increase in Edwards' offense level, *see* U.S.S.G. § 2B1.1(b)(1). This yielded a total offense level of 18 and an advisory Guidelines range (in light of a prior conviction) of 30 to 37 months' incarceration. *See* U.S.S.G. ch. 5, pt. A (sentencing table).[1] The court sentenced Edwards to a prison term of 33 months on each count, to be served concurrently.

---

[1]The district court sentenced Edwards after the Supreme Court's decision in *United States v. Booker*, and followed *Booker*'s instruction to treat the Sentencing Guidelines as advisory. *See* 543 U.S. 220, 245-46 (2005).

6

II

Edwards raises two challenges to his sentence, one legal and one factual. First, he argues that the district court erred by treating the "value of . . . the benefit . . . to be received in return for the payment," U.S.S.G. § 2C1.1(b)(2)(A), as the cost differential between conducting a friable and a nonfriable abatement. Edwards maintains that, as a matter of law, Keystone did not benefit by that amount because it would not have been "legally required to spend that extra sum to conduct a friable abatement . . . if there had been no bribery solicitation at all." Appellant's Reply Br. 6. Second, he argues that the district court made a clear factual error when it found that the cost differential was $100,000.

We review sentencing decisions under a "'reasonableness' standard." *United States v. Booker*, 543 U.S. 220, 262 (2005); *see also Rita v. United States*, 127 S. Ct. 2456, 2459 (2007). Although *Booker* rendered the Sentencing Guidelines "effectively advisory" rather than mandatory, 543 U.S. at 245, the Sentencing Reform Act "nonetheless requires judges to take account of the Guidelines together with other sentencing goals" listed in the statute, *id.* at 259 (citing 18 U.S.C. § 3553(a)). "A sentencing court acts unreasonably if it commits legal error in the process of taking the Guidelines or other factors into account, or if it fails to consider them at all." *United States v. Bras*, 483 F.3d 103, 106 (D.C. Cir. 2007) (citing *United States v. Simpson*, 430 F.3d 1177, 1185-87 (D.C. Cir. 2005); *United States v. Price*, 409 F.3d 436, 442-43 (D.C. Cir. 2005)). A sentencing court also acts unreasonably if the sentence rests on a finding of fact that is clearly erroneous. *See United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007); *cf. United States v. Olivares*, 473 F.3d 1224, 1229 (D.C. Cir. 2006). With this standard of review in mind, we consider each of Edwards' challenges.

7

A

Edwards' legal challenge turns on the meaning of "value of . . . the benefit . . . to be received in return for the [bribe]." U.S.S.G. § 2C1.1(b)(2)(A). He notes that, after his arrest, "Keystone proceeded to demolish the [structures] using substantially the same non-friable abatement plan that it had submitted to Mr. Edwards for review." Appellant's Br. 26. Edwards argues that, because the District eventually permitted Keystone to implement the less expensive abatement plan that Edwards had approved in exchange for the bribe, the bribe "would [not] have resulted in any meaningful 'benefit' within the meaning of § 2C1.1." *Id.* And since "there was no 'benefit' to Keystone," *id.* at 22, Edwards believes that the district court should have increased his offense level based only on the value of the $10,000 payment, *see id.* at 25; *see also* U.S.S.G. § 2C1.1(b)(2)(A) (providing that the increase in the offense level is based upon "the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense, whichever is greatest").

The government does not dispute that Keystone was lawfully entitled to implement the less-expensive, nonfriable abatement plan. Indeed, it is part of the outrage of Edwards' extortionate conduct that he coerced a contractor into paying him $10,000 for the privilege of doing that which the contractor could lawfully have done for free. But this does not mean that Keystone did not receive a "benefit" in exchange for the payment. In fact, it did: Keystone received the benefit of being allowed to demolish the structures at substantially less expense than if it had not made the payment -- because without the bribe, Edwards would not have approved the cheaper, nonfriable abatement plan.

Edwards concedes that, if the contractor had paid $10,000 for approval of an abatement plan to which it was *not* lawfully entitled, the benefit to the contractor would have been the cost differential between that plan and the more expensive, legally required plan. *See* Appellant's Br. 28 n.9; Appellant's Reply Br. 2, 6. But he maintains that, because Keystone paid $10,000 to obtain approval for a less expensive abatement to which it *was* lawfully entitled, the value to the contractor was zero. *See* Appellant's Br. 26; Appellant's Reply Br. 7-8. There is nothing in the phrase "benefit . . . to be received" that suggests this difference in treatment. Moreover, nothing explains why a contractor would pay $10,000 to receive no benefit at all. To the contrary, Keystone's $10,000 bribe purchased the benefit of foregoing the expensive measures associated with a friable abatement. The fact that Edwards' bribery scheme was ultimately unsuccessful, and that Keystone was later permitted to implement a less expensive, nonfriable abatement plan without paying $10,000, are of no moment. *See United States v. Chmielewski*, 196 F.3d 893, 894-95 (7th Cir. 1999) (holding that a company that paid an OSHA inspector $2,000 to "wipe away" a $35,000 fine received a "benefit" of $35,000, even though the fine was later reduced to $6,000 through a lawfully negotiated settlement); *United States v. Muhammad*, 120 F.3d 688, 701 (7th Cir. 1997) ("The mere fact that [a] bribe was not successful does not prevent [the court] from using the ascertainable benefit that the bribe intended to influence in order to enhance [the defendant's] sentence.").

Moreover, Edwards' theory would have an illogical consequence: it would lead to identical Guidelines offense levels for extortion schemes of vastly different proportions. On his theory, a government procurement officer who demanded $10,000 before permitting an eligible contractor to receive a contract worth $100,000 in profits would have the same offense level as an officer who insisted on the same payoff for

approving a contract worth $100,000,000 in profits. In each case, Edwards would rate the "benefit to be received" as zero and increase the base offense level by the value of the (identical) bribe. *See* Oral Arg. Recording at 14:00. But this cannot be. "[T]he purpose of § 2C1.1 . . . is to measure the true harm from the crime," *Muhammad*, 120 F.3d at 701, and to assign harsher sentences to defendants who participate in more harmful crimes, *see* U.S.S.G. § 2C1.1 cmt. background ("[F]or deterrence purposes, the punishment should be commensurate with the gain to the payer or the recipient of the bribe, whichever is higher."). It would defy this purpose to assign identical Guidelines ranges in the two extortion schemes outlined above, notwithstanding that the threatened loss in one is 1,000-times greater than in the other.

Although no defendant has previously advanced Edwards' theory in this circuit, a defendant did make a similar argument in the Eighth Circuit. The defendant in *United States v. Hang* was a public housing official who told people on a waiting list for public housing "that they would have to pay him money in order to obtain federally subsidized housing." 75 F.3d 1275, 1278 (8th Cir. 1996). The district court found that "the benefit received by [the] victims in return for their payments" to the official was the difference between the "fair rental value" of the housing they received and the rent they actually paid under the federal subsidy program. *Id.* at 1284. The defendant objected (as Edwards objects here) on the ground that "each of the victims was otherwise eligible for public housing." *Id.* But the court of appeals rejected that argument, noting that the official had told the victims that they would not get the housing if they did not pay him the bribes. *See id.*

Finally, Edwards argues that, "even if the government's analysis [of the meaning of "benefit"] is proper, its argument clearly rests on a factual assumption that the record does not

support" -- that "Edwards was the final authority on the abatement matter," and that Keystone could not have appealed his corrupt friability determination to his supervisor. Appellant's Reply Br. 9. In truth, there are two assumptions here: the government's "factual assumption" and Edwards' own legal assumption that it matters whether he *actually* had -- as he suggested to Keystone -- final authority to require the more costly containment. *See* Government's Supplemental Mem. in Aid of Sentencing at 4 (citing a tape-recorded conversation between Elizondo and Edwards, in which, after Elizondo said that he might appeal Edwards' friability determination, Edwards said, "*I* issue the waiver" (emphasis added)).

We are not so sure that Edwards' legal assumption is correct. Why, after all, should a good bluffer receive a lower sentence simply because he does not actually hold all the cards? We need not ponder that cosmic question, however, because the only evidence in this case is that Edwards did indeed hold all the cards -- thus validating the government's "factual assumption." Edwards' supervisor, Leela Sreenivas, testified that she relied "completely" on her inspectors' recommendations regarding asbestos abatements and had never overruled an inspector's technical review. Trial Tr. 42 (Apr. 27, 2004). She also said that "[a]ll the responsibility" for the abatement project at the waste facility "was assigned to Jeffrey Edwards." *Id.* at 62. This evidence is more than sufficient for a finding that Edwards had the ultimate authority to determine whether a friable abatement was necessary.

In sum, the district court committed no error, legal or otherwise, in concluding that Keystone received a valuable "benefit," within the meaning of Guideline § 2C1.1(b)(2)(A), from the bribe extorted by Edwards. We therefore reject the defendant's first challenge to his sentence.

B

Edwards' second challenge targets the district court's factual finding that a friable abatement would have cost at least $100,000 more than a nonfriable abatement. We review this finding only for clear error. The relevant commentary to the loss table referenced in § 2C1.1(b)(2)(A) instructs that "[t]he court need only make a reasonable estimate of the loss," and that, because "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence[,] . . . the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1 cmt. n.3(C).

In making its finding, the district court considered the only two pieces of evidence in the record: Elizondo's testimony, at trial, that Edwards had told him the additional cost of a friable abatement would be about $100,000, *see* Trial Tr. 34 (Apr. 29, 2004 (AM)); and the trial testimony of P.J. Goel, another contractor who had bid on the job at the waste transfer facility, that "the difference between doing [the abatement] friable versus non-friable . . . was roughly $200,000," Trial Tr. 86 (Apr. 28, 2004 (PM)). After noting that there were reasons to discount Goel's estimate somewhat, the court concluded that "the preponderance of the evidence does support at least a $100,000 valuation of the benefit." Sentencing Hr'g Tr. 10; *see* U.S.S.G. § 6A1.3 cmt. (providing that the "use of a preponderance of the evidence standard is appropriate . . . in resolving disputes regarding application of the guidelines to the facts of a case"); *Bras*, 483 F.3d at 107-08 (confirming that the preponderance of the evidence standard remains applicable post-*Booker*). Indeed, the $100,000 and $200,000 figures represented not just the "preponderance" of the evidence, but the *only* evidence before the court.

Edwards raises two challenges to the district court's consideration of this evidence. First, he suggests that the court should not have relied on the $100,000 figure as a basis for valuing the benefit because it represented "an alleged extortionist's less-than-credible effort to encourage payment." Appellant's Br. 29. It is hard to sympathize with this suggestion, since the extortionist referred to is Edwards himself. Notwithstanding Edwards' attack on his own credibility, we do not think it was error for the district court to consider the defendant's own estimate of the cost differential. *Cf.* FED. R. EVID. 801(d)(2) (providing that an out-of-court admission by a party is not hearsay).

Second, Edwards contends that the court should not have relied on either of the two cost figures because "it is clear beyond cavil that neither was admitted for the truth." Appellant's Br. 32. The trial transcript, however, does not indicate that the testimony was admitted on a limited basis. In any event, there is no need either to cavil or to quibble, since a sentencing judge "may appropriately conduct an inquiry . . . largely unlimited either to the kind of information he may consider, or the source from which it may come." *Bras*, 483 F.3d at 108 (internal quotation marks omitted); *see* U.S.S.G. § 6A1.3. ("[T]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Edwards is certainly correct in suggesting that he had little incentive to challenge the veracity of the two estimates at trial, since the cost of the abatement was not relevant to his culpability. But he is wrong in maintaining that he "was deprived of a fair opportunity to test the reliability of the friable-abatement cost figures upon which the court's guideline analysis was based." Appellant's Reply Br. 2. Edwards does not

contend that the district court barred him from presenting his own cost evidence (or from calling the government's trial witnesses for cross-examination) at the sentencing hearing. Although a footnote in Edwards' sentencing memorandum did request an evidentiary hearing, *see* Def.'s Mem. in Aid of Sentencing 14 n.10, Edwards did not renew that request or offer any such evidence when the court expressly invited him to do so at the sentencing hearing, *see* Sentencing Hr'g Tr. 4-5. Edwards' appellate brief quotes the prior footnote (without elaboration) in a footnote of its own. Appellant's Br. 32 n.12. But if that footnote-in-a-footnote was intended to raise the issue on appeal, it is plainly insufficient to do so. *See Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 546 (D.C. Cir. 2006) (citing *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 93 n.3 (D.C. Cir. 2002); *Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999)).

## III

For the foregoing reasons, the judgment of the district court is

*Affirmed.*